UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                         Case No. 06-51407-WS
    WANZA HEATH,                               Chapter 7

                    Debtor.                    Honorable Walter Shapero
_____/

## OPINION DENYING UNITED STATES TRUSTEE'S MOTION TO DISMISS

### I. Introduction

Before the Court is the United States Trustee's Motion to Dismiss For Abuse Debtor's Chapter 7 Case Under 11 U.S.C. § 707(b)(2) and § 707(b)(3).[1] The issue under § 707(b)(2) is what constitutes special circumstances for which there is no reasonable alternative that will rebut the statutorily defined presumption of abuse. The issue under § 707(b)(3) (where the presumption of abuse does not exist or has been rebutted) is whether the totality of the circumstances demonstrate abuse. After hearing arguments and holding an evidentiary hearing, the Court took the issue under advisement.

### II. Facts

On August 21, 2006, Wanza M. Heath ("Debtor") filed for chapter 13 protection. Her scheduled combined monthly net income was shown as $2,749.17,[2] and her non-priority unsecured debt was scheduled as $36,256.39. The Debtor is some 51 years in age and was employed at Ford Motor Company for approximately 21 years. The Debtor, however, has carpal tunnel syndrome and

---

1. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Publ. L. No. 109-8, § 102(a) (2005), became effective in cases filed on or after October 17, 2005. All code section references are to Title 11 as amended by BAPCPA.

2. This includes her net wages and a $300 regular contribution to family expenses. Her gross income from her job was $4,761.00.

had been working under appropriate restrictions since 1990. Debtor received physical therapy for her condition and had surgery to correct it. It was not cured, and she remained on work restrictions. The last position she held was putting tags on heating cores. In the Fall of 2006, the Debtor was presented with the options of taking a buyout based on early retirement, or, risk being laid off. She elected the former, and October 31, 2006, was her last working day. There were a number of objections to her proposed plan which apparently coupled with her thusly reduced income caused, the Debtor to convert her case to chapter 7 on November 24, 2006. As of February 12, 2007, the Debtor had received no income since December 2006, but her early retirement payments were to begin shortly, amounting to grosses of $2,124.77 a month, or $25,497.25 a year. Due to her physical restriction, age, and the flagging Detroit economy, the Debtor decided not to actively seek alternate employment following her last working day.

### III. Presumption of Abuse

Section 707(b)(2)(A) creates a presumption of abuse in certain cases:

> (2)(A)(i) In considering . . . whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of--
>     (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or
>     (II) $10,000.

The code in § 707(b)(2)(A)(ii) has standard expenses based on the Local and National Standards as issued by the Internal Revenue Service, but subparagraphs relating to expenses are not at dispute in this case. Current monthly income is a defined term:

> The term "current monthly income"--
> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, <u>derived during the 6-month period</u> ending on--

2

> (i) <u>the last day of the calendar month immediately preceding the date of the commencement of the case</u> if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii) . . . . 11 U.S.C. § 101(10A) (emphasis added).

For the Debtor, 25% of the non-priority unsecured claims is $9,063.10. Therefore, the monthly disposable income multiplied by 60 must be less than $9,063.10.[3] The presumption of abuse thus arises because her pre-petition monthly income less the approved expenses in the means test was $719.88. That figure multiplied by 60 equals $43,192.80 which is well above $9,063.10.

### V. Rebutting the Presumption of Abuse

The presumption of abuse as such is rebuttable. The code provides some guidelines for rebutting the presumption in § 707(b)(2)(B)(i):

> In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

Additionally, § 707(b)(2)(B) adds:

> (ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide--
>     (I) documentation for such expense or adjustment to income; and
>     (II) a detailed explanation of the special circumstances that make such
>     expenses or adjustment to income necessary and reasonable.
> (iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

---

3. For § 707(b)(2)(A)(i)(I): $9,063.10 is greater than $6,000, therefore, the threshold for the presumption is $9,063.10 because it is less than $10,000.

3

Once the special circumstances are proven and the new expenses or changed income are taken into account, the means test is performed again under § 707(b)(2)(B)(iv), and if the Debtor then falls below the threshold of the means test, the presumption has been successfully rebutted.

The issue of what constitutes special circumstances is one of first impressions in this district. Indeed, only a handful of cases have addressed the issue nationwide. Two cases have analyzed the related issue of projected disposable income in a chapter 13 plan when a debtor become unemployed: *In re Hanks*, 2007 WL 60812 (Bankr. D. Utah Jan. 9, 2007) and *In re Clemons*, 2006 Bankr. LEXIS 1366 (Bankr. N.D. Ga. June 1, 2006). Section 1325 states that a debtor's plan should use all of a debtor's projected disposable income and references current monthly income as defined by § 101(10A) and expenses as determined by § 707(A) and (B).

### A. Case law under § 707(b)(2)(B)

The majority of the case law regarding special circumstances has involved increases in expenses rather than income reduction. Nevertheless, the discussions in the increased expense situations of what "special circumstances" and "no reasonable alternative" mean are illuminating. The two cases that involved special circumstances for income reduction, in which the presumption, was not rebutted, differ significantly from the case at bar.

In *In re Batzkiel*, 349 B.R. 581 (Bankr. N.D. Iowa 2006), the presumption of abuse arose for the joint debtors. The court found that special circumstances did arise because of justified increases in debtors' expenses and consequent decrease of disposable income below the abuse threshold. *In re Batzkiel*, 349 B.R. at 586-7. The facts were that (a) the Batzkiels had increased vehicle operating expenses, due in part to longer commutes–70 miles round-trip for the wife and 40 miles round-trip for the husband, *Id.* at 583, and (b) increased vehicle operating expenses stemmed from the husband's

4

numerous collisions with deer–(seven from 2003 to mid-2005. *Id*.) and the Batzkiels' insurance company's threats to cancel their insurance if they continued to make deer related claims; resulting in Mr. Batzkiel paying out of pocket for many of the repairs, *Id*; that state of affairs also required the Batzkiels' to maintain another vehicle because at any given time one car could be inoperable due to a deer related collision. *Id.* In sum, the court concluded the Debtors properly documented the indicated expenses, and the facts constituted special circumstances justifying a deviation from the standard vehicle operating expenses thereby rebutting the presumption of abuse. *Id.* at 586-87.

In *In re Starkey*, Lexis 155 at *3(Bankr. D. Neb. Jan 25, 2007), the presumption of abuse arose, and the debtors attempted to rebut it based on increased housing expense. The debtors were trying to justify housing expenses of $3,300.00 and utility expenses of $490.00. *Id.* The local standard for Virginia was $1,879.00 for housing and utilities. *Id.* at *4. The court found that living in an expensive area did not justify an increased expense. *Id.* at *6-7. The court stated that "[i]t is up to [d]ebtors to show that their particular circumstances are 'special' and not simply the same circumstances faced by any other family in the locality in which [d]ebtors live." *Id.* at *6.

In *In re Oliver*, 350 B.R. 294 (Bankr. W.D. Tex. 2006), the presumption of abuse arose and the debtor attempted to rebut it by alleging additional transportation expense, and, an adjustment of income. Mr. Oliver's employment required that he drive approximately 3,000 miles a month which with gas prices as they were amounted to an expense of approximately $600. *Id.* at 298. He also expected a change in his employment such that he would no longer receive bonuses, but he did not provide any documentation for this expected change or consequences to his salary. *Id.* Additionally, the debtor testified, but did not document, that he had a diagnosis of depression, anxiety, and bipolar disorder. *Id.* The court found that (a) it could not adjust Mr. Oliver's income when he remains

5

employed at the same job and there was not evidence to indicate that he would no longer receive bonuses, *Id.* at 300; (b) that the actual gasoline expense was a necessary expense, *Id.* at 302; and (c) that the referred to mental condition could not be considered because the debtor provided no evidence as to how it affected the debtor's income or expenses. *Id.* at 303. After the court made the justifiable deduction for the increased transportation expense, the debtor's monthly disposable income remained above the abuse threshold.

In contrast to the *Oliver* case, there is *In re Sparks*, 2006 WL 3953348 (Bankr. E.D. Tex. Oct. 18, 2006), in which the court found that debtor's extra transportation expenses did not rise to the level of special circumstances. Mr. Sparks' employment required a 40 mile a day round trip, and additionally he frequently drove to visit family. *Id.* at *3. While the court noted that none of the extra transportation expenses were documented (which is required by § 707(b)(2)(B)(ii)(I)), its holding was based on an analysis of special circumstances. *Id.* at *3-4. The court stated that examples of special circumstances in the code "depict [a] type of unanticipated development." *Id.* at *4. The exception said the court must be strictly construed so as to allow only those expenses which are "truly unavoidable" and "to coerce the *higher income* debtor into a Chapter 13 proceeding." *Id.* (emphasis added).

In *In re Graham*, 2007 Bankr. Lexis 720 at *10-11 (Bankr. S.D. Ohio March 6, 2007), the court stated as an alternate holding that the maintenance of two separate households amounted to special circumstances. Mr. Graham was unable to find gainful employment in Ohio but did find work in Virginia. *Id.* at *2. Mrs. Graham was unable to relocate because custody in her Shared Parenting Plan was contingent upon her staying in the area. *Id.* *2-3. Mr. Graham scheduled his second household expenses simply as household expense, and the court held that there was nothing in the

6

code to indicate that joint debtors cannot have two sets of household expenses. *Id.* at *10-11. The court went on to conclude as noted, that the expenses were justified by special circumstances. *Id.* at *11. The U.S. Trustee in the case argued that special circumstances were limited to those items outside of the debtors' control, but the Court disagreed stating that "[n]othing in the statute suggests or mandates that the 'special circumstances' be outside of the control of the debtor." *Id.* at *12.

In *In re Ferando*, 2007 Bankr. LEXIS 607 at *2-3 (Bankr. D. Neb. March 1, 2007), the debtor worked on commission. She argued that her current monthly income was artificially inflated by high commissions during the six months prior to filing. *Id.* at *3. The court stated that the debtor had not shown that there was a large, unique commission during the time period, or any reason that here income would be dramatically different during the pendency of a chapter 13. *Id.* at *4-5.

In the case before this Court, Debtor's circumstances, in light of the recited case law, are less akin to those in which special circumstances did not arise, than those in which debtors were able to rebut the presumption. First, in the two cases dealing with adjustment of income (*Oliver* and *Fernando*) the debtors failed to satisfy their burden of proof that their incomes would decrease or was lower. In contrast, Ms. Heath has an credibly shown her change in income due to the buyout, and the argument that she "could" or "can" supplement her post-buyout income with a job sensitive to her work restrictions carries about the same weight (or lack thereof) as the bonus reduction or commission difference potentials in the *Oliver* and *Fernando* situations. Also, in the *Oliver* case debtor attempted to justify extra expense and a possible loss of income by mental illness, and the court observed that he had been employed for 17 years at two different jobs without incident, in contrast to Ms. Heath who has worked at a single job for 21 years, but with documented restrictions since 1990. Moreover, new employment is not without its attendant costs. In the *Graham* case,

7

debtor's new employment after being unemployed, required him, because of the troubled economy, to go elsewhere to find work thus creating the incidence of much higher than normal (i.e: "special") expenses.

Most of the cases are debtors attempting to justify higher expenses as special circumstances and not higher incomes. The analysis is somewhat different. For expenses, Congress expressly chose in § 707(b)(2)(A)(ii) to calculate expenses based on the National and Local Standard issued by the Internal Revenue Service. Therefore, in *Starkey*, the debtors' attempt to justify higher housing expenses because the area was an expensive place to live was in contradiction of Congress's mandate to apply a local standard, and express desire not to allow debtors to take any expense they desired or in any amount. Congress, however, chose to use an actual income test for the Means Test, and while the test is for an average of six months prior to filing, it is clear why Ms. Heath is no longer receiving the same income. She was laid off through no fault of her own.

It is also necessary to consider the meaning of "no reasonable alternative." In the *Batzkiel* case, the debtors were allowed excess transportation expense due to long commutes to work and accidents. There are alternatives to long commutes to work, i.e.: seek new employment or move closer to work. The court, however, did not look for the debtors to attempt to do either. Moving or looking for a job are perfectly reasonable alternatives when one thinks in the long term, but not ordinarily feasible within the time frame it takes to confirm a chapter 13 case. Similarly, Mrs. Graham could have sought a change in the Shared Parenting Plan in court due to a material change in circumstances which is a perfectly reasonable alternative to operating two households. Once again, it would be unreasonable to put a chapter 13 on hold while such an attempt was ongoing. Actions

that are reasonable and conceivable in the long term, are not necessarily reasonable alternatives during the bankruptcy process.

### B. Case law under § 1325(b)(1)(B)

Two cases concerning projected disposable income under § 1325(b)(1)(B) are of particular interest for comparison because the cases concern chapter 13 debtors whose current monthly income no longer reflected reality due to unemployment. Disposable income is defined in § 1325(b)(2) current monthly income received less the reasonably necessary expenses as determined by § 707(b)(2).[4] Section 1325(b)(1)(B) requires all *projected* disposable income *received* by the debtor to paid in a chapter 13 plan. The analysis justifying a "projected disposable income received" that differs from the "disposable income" which is based purely on income from the six months prior to filing is additional guidance as to what a "special circumstance" that rebuts the presumption of abuse.

In *In re Clemons*, 2006 Bankr. LEXIS 1366, at *1 and *5, one of the joint debtors lost her job two months after filing for chapter 13. The court drew attention to the contrast between § 707(b) which specifically provides for an adjustment based on "special circumstances," and § 1325(b)(1) which relies solely on the words "projected" and "received." *Id.* at 12-13. The court stated that "Congress . . . recognized that it would be senseless to bar a debtor lacking any reasonable prospect in the near term to repay debt from obtaining a discharge merely because that debtor once had a higher income." *Id.* at *13. The court found the two sections to be comparable counterparts. *Id.* at *14. In holding that it was appropriate to adjust the projected disposable income to reflect Mrs.

---

4. Section 1325(b)(3) actually states that the reasonably necessary *expenses* are to be determined by § 707 whereas disposable income under § 1325(b)(2) is defined in reference to current monthly income less certain listed payments. Therefore, the special circumstances exception in § 707 should not apply to income. Courts, nevertheless, have applied it, and their analysis is still instructive.

9

Clemons' employment status, the court stated that "[t]here is no question that if this case proceeded under Chapter 7, the Court could adjust the Clemonses' income to account for the special circumstance of job loss." *Id.* at *15.

In *In re Hanks*, 2007 WL 60812 at *1, Mr. Hanks, a joint debtor, was released prepetition from his job as a computer programmer. Mr. Hanks's new employment was as a movie watcher screening movies for inappropriate content which paid less than half of his former computer programming job. *Id.* The court acknowledged that adjustments to income could be made under § 707(b)(2) for "special circumstances." *Id.* at *5. Despite Mr. Hanks' "credible testimony" regarding his job search, the court felt that unemployment was not comparable to the "special circumstances" that were given as examples: serious medical condition or a call to active duty in the Armed Forces. In addition to the possibility to receiving employment similar to computer programming, the court felt that reasonable alternatives might be a second job, overtime work for either debtor, a reduction in expenses, or assistance from family. *Id.* at *5.

It is somewhat difficult to reconcile the disparate positions of the court in *Clemons* and the court in *Hanks*. The *Clemons* court did not even consider whether Mrs. Clemons had searched for a job, nor did they consider any factors such as economic conditions, education or training, or disability. The special circumstance was losing her job, not remaining unemployed. *In re Clemons*, 2006 LEXIS 1366 at *5-6. The court in *Hanks*, however, recognized that Mr. Hanks had been looking for work for some time and acknowledged that he was a credible witness, but did not consider Mr. Hanks' situation a special circumstance.

The *Hanks* court seems to believe that "reasonable alternative" is modifying "adjustment." Hence, the conclusion that other adjustments can be made such as reducing actual expenses or getting

assistance from family members. A survey of the cases shows that most courts consider "no reasonable alternative" to modify "special circumstance." The Batzkiels were not required to reduce their other expenses to compensate for their increased transportation expenses nor was Mr. Oliver. Mrs. Graham was not required to get a second job to compensate for the maintenance of two households. The idea of adjusting expenses to compensate for lost income is also in conflict with § 707(A) and (B) which expressly approve certain expenditures. The Hankses' expenses should already be reduced to the minimum amount.

Nevertheless, Ms. Heath is clearly distinguishable from Mr. Hanks. Mr. Hanks was a trained computer programmer with no mentioned disability. Ms. Heath is a blue collar worker with no higher education and carpal tunnel syndrome. Her only experience is as a line worker in the auto industry which is in palpable decline, at least in the Detroit area. The reasoning of the *Clemons*' court that the special circumstance is the job loss is more convincing, as is its argument that Congress did not intend to prevent debtors from obtaining relief simply because that debtor once had a higher income.

A job search, depending on time, opportunities, and circumstance and indeed geography, can take three to six months or more. A search for an average debtor may or may not be too long to make a bankruptcy case wait. Ms. Heath, however, is not the average debtor. She is older, has worked at relatively unskilled labor her entire life, and has worked with material restrictions. Accordingly, her unemployment, which is through no fault of her own, is a special circumstance that justifies an adjustment of income to the amount she currently earns.

## VI. Totality of the Circumstances

11

For cases in which the presumption of abuse does not arise or is rebutted, the Court must consider whether the case was nevertheless filed in bad faith or whether under the totality of the circumstances granting relief would be an abuse of chapter 7. 11 U.S.C. § 707(b)(3). Prior to the BAPCPA, a case could be dismissed for "substantial abuse." *In re McIvor*, 2006 WL 3949172, at *4 (Bankr. E.D. Mich Nov. 15, 2006). Courts have found that the "standard for evaluating abuse under . . . the new act is identical to the standard used for determining 'substantial abuse'" under the old act. *Id. See also In re Travis*, 353 B.R. 520, 530 (Bankr. E.D. Mich. 2006); *In re Zaporski*, 2007 WL 1186032, at *11 (Bankr. E.D. Mich. April 17, 2007). It is argued that the elimination of the word "substantial" from the prior statute has meaning enough to in essence change the abuse threshhold. While as a matter of statutory construction one should assume the deletion was intended to effect a meaningful change, the word "substantial" means having substance or carrying weight. When, in particular, it is used in connection with the word "abuse," which in and of itself embodies such, the difference between the old and new statute is too subtle to be able to draw a meaningful distinction, and, to the extent one might be able to, would not make a difference under the facts in this case. In *In re Krohn*, 886 F.2d 123, 126-27 (6th Cir. 1989), the court while stating that "it is not possible . . . to list all the factors that may be relevant to ascertaining a debtor's honest" courts should consider (1) the debtor's good faith and honesty in filing his or her schedules; (2) eve of bankruptcy purchases; (3) unforseen catastrophic events that forced the debtor into chapter 7; (4) the debtor's ability to repay his or her debts; (5) stability of income; (6) state remedies; and (7) debtor's ability to reduce expenses.

The U.S. Trustee (which has the ultimate burden of proof) has not shown that the Debtor, under the totality of the circumstances, is abusing chapter 7. The Debtor initially filed in chapter 13 and proposed a plan that paid 100% of her debt in less than five years, but layoffs forced her into early

12

06-51407-wsd    Doc 81    Filed 07/06/07    Entered 07/06/07 18:00:25    Page 12 of 13

retirement and cut her pay in half. While her retirement income is stable, the small amount of surplus income is attributable to another source, and the reliability of these payments is unknown. There have been no allegations that the Debtor has been dishonest in her schedules; no allegations that she splurged prior to bankruptcy, and there are no allegations that she has excessive expenses.

### VII. Conclusion

Ms. Heath has proven special circumstances that rebut the presumption of abuse. Accordingly, the U.S. Trustee's Motion to Dismiss the Debtor's Chapter 7 Case Under § 707(b)(2) is denied. The U.S. Trustee has not shown that the totality of the circumstances indicate that the Debtor is abusing chapter 7. Accordingly, the U.S. Trustee's Motion under § 707(b)(3) is denied.

**Signed on July 06, 2007**

```
                            /s/ Walter Shapero
                    Walter Shapero
                    United States Bankruptcy Judge
```